# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RICARDO GOMEZ,                          )
                                        )
    Plaintiff,      )
                                        )  No. 16 C 7743
    v.              )
                                        )
CITY OF CHICAGO, FIRE DEPARTMENT        )  Judge Thomas M. Durkin
                                        )
    Defendant.       )

## MEMORANDUM OPINION AND ORDER

Plaintiff Ricardo Gomez brings this lawsuit against the City of Chicago (the "City") alleging a hostile work environment under Title VII of the Civil Rights Act of 1964. The City moved for summary judgment. R. 64; R. 72.[1] For the reasons set forth below, the Court grants the City's motion.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of

---

[1] The City's motion was initially filed in redacted form, and then refiled under seal with the Court's permission and without redaction.

evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

The following facts are undisputed unless otherwise noted. Ricardo Gomez is a Puerto Rican/Hispanic firefighter who began training with the City of Chicago Fire Department ("CFD") in May 2005 and has worked in that capacity ever since. R. 73 ¶¶ 1, 4. Gomez was initially assigned to Engine 57 located at 1244 North Western Avenue before his transfer to Engine 110 at 2322 West Foster Avenue in or around November 2010.[2] *Id.* ¶¶ 5, 6.

***The 2012 note and investigation.*** According to Gomez, on or about January 28, 2012 and while at Engine 110, a form completed by CFD personnel to request a transfer to another firehouse with the word "spic" written on it fell out of his locker. *Id.* ¶ 7. Gomez was familiar with the CFD's General Orders ("G.O.'s") and with the policies concerning discrimination, harassment and reporting. *Id.* ¶ 12. G.O. 93-018, effective at that time, expressly prohibited "[d]iscrimination and/or harassment on the basis of race, color, religion, sex, national origin, age, ancestry," and promised that "[t]he department takes each and every complaint of discrimination and/or harassment seriously," and that each one would be "thoroughly investigated." *Id.* ¶¶

---

[2] The capitalized term "Engine" in this context refers to a specific fire station.

8, 10. G.O. 93-018 allowed employees to file a complaint of discrimination or harassment in multiple ways, including by notifying department supervisors or through the appropriate grievance procedure, and provided that a complaint received by supervisors would "confidentially" and immediately be forwarded to the appropriate Deputy Fire Commissioner, who would in turn designate an investigator. *Id.* ¶ 11.

Consistent with G.O. 93-018, Gomez reported the note to his superior officer, Lieutenant Kevin Peters. Lt. Peters in turn reported it to Battalion Chief Joseph Santucci that same day.[3] *Id.*; R. 82-2 ¶ 20. And Lt. Peters read G.O. 93-018 to Gomez, and then to all employees present at Engine 110 that day, indicating while referencing its provisions that any harassment was prohibited and would not be tolerated. R. 73 ¶ 8.

Battalion Chief Santucci immediately prepared an incident report, ultimately causing the Internal Affairs Division to open an investigation. *Id.* at 13. During the investigation, Gomez alleged that he had received other (blank) transfer forms while at Engine 110: in his work boots in May 2011; in his locker in October 2011; and in his work coat in January 2012. He also reported that he found a water bottle in his work boots in January 2012. *Id.* ¶ 14. Gomez had not reported these or any other incidents previously. *Id.* ¶ 15. Gomez complained to investigators that he "didn't feel

---

[3] The CFD is structured as follows, from lowest to highest rank: firefighter, engineer, lieutenant, captain, battalion chief, deputy district chief, district chief, assistant deputy fire commissioner, deputy fire commissioner, first deputy fire commissioner and fire commissioner. R. 73 ¶ 27.

like part of the clique," and that neither the Caucasian firefighters nor Hispanic engineer Alfredo Ruiz spoke to him. R. 82-2 ¶ 4; R. 73 at Ex. L, p. 2-3. Gomez was interviewed twice in February 2012 and a third time in October 2012. R. 73 ¶¶ 18, 19. The IAD investigator gave Gomez her business card and advised him multiple times over the course of the investigation that he could contact her at any time. But Gomez made no further complaints. *Id.*

In addition to interviewing Gomez, the IAD investigator also interviewed Battalion Chief Santucci and Lt. Peters once Santucci returned from medical leave in September 2012. *Id.* ¶ 19. And during the weeks following Gomez's report, Lt. Peters spoke to all Engine 110 firefighters, including minority firefighters with Hispanic surnames. None had experienced any racially offensive, harassing or derogatory conduct. Nor had any witnessed other firefighters treating Gomez in an offensive or racially discriminatory manner. *Id.* ¶ 9.

Gomez requested a transfer out of Engine 110 on or about February 12, 2012. He was thereafter permitted to work temporarily at other engines, and was transferred to Engine 89 at 3945 West Peterson Avenue on a permanent basis in April 2012. *Id.* ¶ 17. The IAD closed its investigation in January 2013 without taking further action. *Id.* ¶¶ 20, 21.

***The 2014 note and investigation.*** On or about April 27, 2014, more than two years after his January 2012 report and while still assigned to Engine 89, Gomez showed his commanding officer Lt. Ted Maj a transfer form that he alleged fell out of his equipment that day. On it were the handwritten words "get out and swim back to

your sh*t hole." *Id.*¶ 22. Approximately one year before, the CFD had rescinded G.O. 93-018 and adopted in its place G.O. 13-006, entitled "Discrimination/Harassment Investigation Policy and Procedures." G.O. 13-006 incorporated the City's Diversity and Equal Employment Opportunity Policy ("EEO Policy"), the purpose of which was to "provide [City employees] an effective means for the resolution of complaints of discrimination and harassment." *Id.* ¶¶ 25, 26. An employee can file a complaint of discrimination, harassment or retaliation under G.O. 13-006 and the EEO Policy by notifying "CFD supervisors, CFD's EEO Liaison (the Deputy Commissioner of CFD Human Resources), City of Chicago Department of Human Resources," or by union grievance. *Id.* ¶ 27 and Ex. U, p. 2. Unlike G.O. 93-018, G.O. 13-006 and the EEO Policy it adopts specifies that the EEO Division shall initiate and direct the investigation, and that supervisors who become aware of conduct that may violate the EEO Policy must report it to "a Department Liaison, or to the EEO Officer or EEO Deputy" or face potential discipline. *Id.* at Ex. U, p. 2 and Ex. T, p. 4-5.

Lt. Maj informed everyone present at the morning call that day about the note, and reiterated that discrimination would not be tolerated while reviewing the relevant anti-harassment and discrimination policies. *Id.* ¶ 22 and Ex. O, p. 2-3. He interviewed almost all of Engine 89's members. None admitted to leaving the note. *Id.* ¶ 22. Lt. Maj also informed his commanding officer, Captain Curley—Battalion Chief Kurt Nelson's reliever—about the note, and notified Battalion Chief Nelson when he returned to Engine 89 on or about April 30. That same day, Battalion Chief Nelson informed Deputy District Chief Hoyle Marshall and Assistant Deputy Fire

Commissioner Mark A. Nielsen about the note, and forwarded Gomez's complaint to CFD's Internal Affairs Division. *Id.* ¶¶ 23, 24, 28. Five days later on May 5, 2014, Assistant Commissioner for the Internal Affairs Division Steven M. Malec notified EEO officer Abel Leon—who oversaw the EEO Division investigations at the time— of Gomez's complaint. *Id.* Gomez was then transferred to Engine 86 at 3918 North Harlem Avenue in May or early June 2014. *Id.* at Ex. X, p. 3.

The EEO Division commenced its investigation on June 18, 2014 by telephoning Gomez to clarify his allegations. Gomez was interviewed in person the next day. R. 73 ¶¶ 29, 30. During the interview, Gomez told investigators that he suspected that David Comiskey—a Caucasian fellow firefighter of the same rank— wrote the note, and reported for the first time that Comiskey also swore at him and was "derogatory and belittling." *Id.* ¶¶ 31, 32, 33. According to Gomez, Comiskey never referenced Gomez's nationality or ethnicity when he swore at him, and Gomez would respond either by ignoring Comiskey, or swearing back. *Id.* ¶ 33. Gomez also complained that Comiskey singled him out for wearing casual clothes, but could not recall complaining about it previously. *Id.* ¶ 47. Gomez told the investigators that he felt "like [Comiskey] had it in for me from day one, whether it's personal, because I'm Hispanic, . . . he didn't like how I looked or talked I don't know." *Id.* ¶ 32.

Gomez complained about other acts alleged to have occurred at Engine 89, including finding a spoiled banana in his pants pocket in October 2013, a transfer form pasted to his locker on February 8, 2014, a nail in his boot on February 14, 2014, and that his helmet was tampered with and his mask pulled out of its pouch. *Id.* ¶¶

35, 50. Gomez accused Comiskey of having something to do with the alleged equipment tampering. *Id.* He further stated that he found blank transfer forms in his gear or locker every couple of months for about 2 years and that orange stickers used for newly hired firefighters were placed on his helmet and he was treated like a rookie despite having 9 years on the job. *Id.* ¶¶ 36, 38. Gomez did not report these incidents previously because he is a "big boy" and did not want to report "every little incident," so he just "let it go." *Id.* ¶ 35 and Ex. X, p. 5; R. 82-1 ¶ 35. Gomez told investigators that other than the January 2012 and April 2014 notes, he had reported no other notes or incidents of racial or ethnic harassment. R. 73 ¶ 36.

Gomez also described an incident with Comiskey that occurred while the 2012 investigation was ongoing in which Lt. Manuel Soto, who was relieving for his and Comiskey's regular supervisor, Lt. Richard Lynch, sent Gomez upstairs to rest because he was not feeling well. *Id.* ¶ 41. He claimed Comiskey got on the microphone in response and said "Hey f*ckin Gomez, why don't you f*ckin lay up," by which he meant take time off for medical reasons. *Id.* Gomez reported that he then came down to the kitchen to confront Comiskey, and Comiskey either "pretend[ed] to be cooking with [a] knife or us[ed] it to threaten me." *Id.* at Ex. X, p. 5. The two men argued, and Lt. Soto intervened, telling Gomez to leave the kitchen, and Comiskey that he was "not going to have this stuff at work." *Id.* ¶¶ 40, 43, 44. The knife did not touch Gomez. This was the first time Gomez reported the incident. *Id.* ¶¶ 43, 45. Gomez also told investigators that earlier that day and in violation of CFD policy, Comiskey suggested that he not be in the "food club," a group whose members contribute money toward

meal preparation. R. 73 ¶ 46 and Ex. E, p. 74; R. 82-2 ¶ 5. Gomez could not recall whether he had previously reported being excluded from the club. *Id.* at Ex. E, p. 77.

When interviewed about the knife incident, Lt. Soto said that in addition to swearing at Gomez and telling him to go "lay up," Comiskey called out on the PA "motherf*cker" and "lazy a** prick spic." R. 82-2 ¶¶ 9, 10. He concluded that "race was the reason Comiskey was treating [Gomez] this way," but also stated that "[o]ther than during this heated argument," he had not heard "this type of racial slur" from Comiskey. R. 82-1 ¶ 44; R. 82-6, p. 3. Lt. Soto did not report the incident to anyone at the time. The parties debate whether he should have. R. 82-2 ¶ 15; R. 93 ¶ 15.

Gomez and Comiskey's then-supervisor Lt. Lynch also witnessed arguments between Comiskey and Gomez. Lt. Lynch specifically recalled intervening in a dispute in which Comiskey critiqued Gomez's job performance. Lt. Lynch admonished Comiskey and spoke to Gomez about the need to do his fair share of daily chores and tasks. R. 73 ¶ 48 and Ex. Y, p. 3; R. 82-1 ¶ 48. Lt. Lynch believed Gomez and Comiskey had different work ethics and personalities. R. 73 ¶ 34. Lt. Lynch had never observed or heard any comments about race or ethnicity, and nor had Gomez ever complained to him about racial discrimination or harassment by Comiskey or anyone else. *Id.* ¶¶ 33, 34. Indeed, while Gomez once told Lt. Lynch about a blank transfer form he had received, he also told Lt. Lynch that it was "not a big deal," and did not allege that it was motivated by his race or national origin. *Id.* And Gomez admitted both to EEO Division investigators and at his deposition that he had never heard Comiskey use any racial language. *Id.* ¶ 49.

In addition to his complaints about Comiskey, Gomez alleged for the first time that fellow firefighter James Pack harassed him in March or April 2014, telling Gomez to "get down here and help" clean up Pack's mess. *Id.* ¶ 37. According to Gomez, Pack also made jokes about Hispanic people to others, which Gomez found offensive but chose to "laugh[  ] off" rather than complain. *Id.* ¶¶ 37, 39.

Gomez also reported that unidentified Caucasian firefighters said the "n-word" every couple of days as well as "beaner" and "Nigger plumb," including in the presence of unidentified officers. *Id.* ¶ 40. He stated that the comments were not directed at anyone in particular because "they know they will lose their job for that." Gomez could not provide dates or identify any witnesses, and had not previously reported the comments. *Id.* But Gomez reported that "things are fantastic at [his] new firehouse" (referring to Engine 86). *Id.* at Ex. X, p. 7.

Gomez was transported from CFD's Medical Division to a hospital because of high blood pressure in June 2014, and took medical leave until May 2015. R. 82-2 ¶¶ 31, 32; R. 93 ¶¶ 31, 32.[4] Gomez was interviewed for a second time in September 2014 regarding discipline he received during his medical leave that he alleged was in retaliation for filing the 2014 EEO Division complaint. *Id.* ¶ 53. And Gomez was interviewed a third time in May 2015 after returning to Engine 86 from medical leave.

---

[4] During his leave, Gomez saw his primary care physician Dr. John Lee for what Dr. Lee diagnosed as work-related stress and anxiety based on Gomez's representations to him. R. 82-10, p. 75. Gomez's former primary care physician Dr. Salvador Gutierrez testified at his deposition that Gomez had multiple high blood pressure readings even before his 2005 hire date, and that he had instructed Gomez to track his blood pressure as early as September 2006. R. 93 ¶ 31 and Ex. 3, p. 21:22-23:9, 88:13-89:11.

During his deposition, Gomez stated that his work environment at that time "may have been" better. *Id.* ¶¶ 54, 55 and Ex. E, p. 178-79. The EEO Division conducted a fourth and final in-person interview with Gomez in March 2016. At that time, he stated that he did not remember Comiskey ever saying "spic," "lazy f*cking spic," "lazy a** prick spic," "go back with your people," or "lazy spic" during the 2012 knife incident. *Id.* at Ex. BB, p. 2. Nor could he recall whether anyone had ever overheard Comiskey swearing at him, and "couldn't tell" if Comiskey was "using that language for a racial reason." He also did not "know why Comiskey bullied and harassed" him, and concluded that "for whatever reason he had it in for me." *Id.* at Ex. BB, p.5. Gomez reiterated that he did not report every incident because he is a "big boy," not a "crybaby" or "whiner," "didn't want to report every little thing," and "it doesn't bother me."[5] *Id.* at Ex. BB, p. 2.

Ultimately, Comiskey was suspended for six days for violations of CFD rules and regulations, including allegations that potentially fell under the City's Violence in the Workplace Policy. *Id.* ¶ 60; R. 82-2 ¶ 28. Comiskey's suspension was not imposed under the EEO Policy. R. 82-2 ¶ 29. But the entire CFD nevertheless underwent training in April 2018 developed in part because of Gomez's 2014 complaint and the subsequent EEO investigation. R. 73 ¶ 61. The training addressed (among other things) diversity and inclusion, discrimination and harassment based

---

[5] Additional interviews during the EEO investigation included Pedro Hernandez in August 2014 and again in July 2016, Manuel Soto in August 2014 and again in May 2016, Ted Maj in October 2014 and again in August 2016, David Comiskey in October 2014, James Pack in July 2015, and Julio Sanchez, Jr. in April 2016. *Id.* ¶ 52.

on all protected categories, retaliation, resources for victims, and mandatory responses by officers. *Id.* Online training was offered in November 2018 for those unable to attend in April. *Id.*

Gomez filed a charge of discrimination with the Equal Employment Opportunity Commission in October 2014.[6] The EEOC issued a right to sue letter in May 2016. *Id.* ¶ 59. Gomez then filed this lawsuit in August 2016, alleging civil rights violations under Title VII, Section 1981, Section 1983 and state law. R. 1. The Court dismissed Gomez's Section 1981, Section 1983 and state law claims on January 1, 2017, leaving only the Title VII hostile work environment claim that is the subject of the City's summary judgment motion. *See generally* R. 20. During his March 2018 deposition, Gomez alleged for the first time that throughout his first day on the job in November 2005, a firefighter called him "spic." Gomez could not name the firefighter or any witness, and had not previously reported the incident. R. 73 ¶ 62.

## Analysis

### I. Local Rule 56.1

As an initial matter, the Court must address Gomez's failure to comply with Local Rule 56.1. The City correctly points out that not only did Gomez fail to cite to a single paragraph of his Local Rule 56.1 statement of facts to support the factual assertions made in his brief, but also his 56.1 statement of additional facts did not adhere to the local rules and the Court's standing order because in it Gomez

---

[6] Gomez initially filed his charge of discrimination unsigned. A signed copy was filed in November 2014.

repeatedly failed to cite to specific lines, paragraphs or pages of the record as required. *See* L.R. 56.1(b)(3) (requiring a non-moving party to support its facts with "specific references to . . . parts of the record"). The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995)). As this Court's standing order makes clear, "Local Rules are not mere technicalities. Failure to abide by the Local Rules may result in the Court striking briefs, disregarding statements of facts, deeming statements of facts admitted, and denying summary judgment." Nevertheless, as explained below, even if Gomez had complied with the local rules and this Court's standing order by properly attributing the factual assertions in his brief and those in his statements of facts, the Court can discern no genuine dispute of material fact sufficient to defeat summary judgment.

## II. Merits

To establish a prima facie case of hostile work environment, Gomez must show: (1) that he was subject to unwelcome harassment; (2) the harassment was based on his national origin or ethnicity; (3) the harassment was so severe or pervasive as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) that there is a basis for employer liability. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) (citing *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009)). Additionally, the conduct complained of must be

both subjectively and objectively offensive. *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). The City argues that Gomez's hostile work environment claim fails under the second, third, and fourth elements, and that there is no genuine issue of material fact to suggest that the alleged harassment was either objectively or subjectively offensive. *See generally* R. 73.[7] The Court's analysis will focus on the fourth requirement: employer liability.

Gomez alleges that fellow firefighters David Comiskey and James Pack perpetrated harassment. There is no dispute that these individuals were co-workers, not supervisors. And Gomez does not name any other alleged harasser. As such, to establish a basis for employer liability, Gomez must prove that the City was negligent in discovering or remedying harassment. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010) (citing *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008)); *see also Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) ("An employer satisfies its legal duty in coworker harassment cases 'if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees.'"

---

[7] The City also contends that the allegations pre-dating those made in connection with Gomez's January 2012 complaint to the City are time-barred because the exception to the continuing violation rule for significant temporal time gaps between acts applies. *See* R. 72 at 16-17 (citing *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017), *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 709 (7th Cir. 2002), and *Selan v. Kiley*, 969 F.2d 560, 567 (7th Cir. 1992)). Gomez does not argue otherwise. Accordingly, because the Court considers Gomez to have waived the argument and finds merit in the City's position, the Court would decline to consider the allegations from 2005 even if it found a basis for employer liability. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) (plaintiff's failure to respond to defendant's argument on summary judgment results in waiver); *see also Selan*, 969 F.2d at 567 (2-year gap between allegations was a "considerable separation [that] weigh[ed] heavily against finding a continuing violation").

(quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998))). "[P]rompt investigation of alleged misconduct [is the] hallmark of reasonable corrective action." *Cerros,* 398 F.3d at 953-54. "Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Parker v. Side by Side, Inc.*, 2014 WL 2932211, at *11 (N.D. Ill. June 27, 2014) (quoting *Lambert v. Peri Fireworks Sys., Inc.*, 723 F.3d 863, 866-67 (7th Cir. 2013)). If the employer has established procedures for reporting complaints of harassment, "the complainant ordinarily should follow that policy in order to provide notice sufficient for the employer to be held responsible." *Lambert*, 723 F.3d at 867. The focus of the notice inquiry, however, is "on whether the complainant adequately alerted his employer to the harassment, 'not whether [the complainant] followed the letter of the reporting procedures set out in the employer's harassment policy.'" *Parker,* 2014 WL 2932211, at *11 (quoting *Cerros,* 398 F.3d at 952-53). But "[a]n employer is not liable for co-employee racial harassment 'when a mechanism to report the harassment exists, [and] the victim fails to utilize it.'" *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 549 (7th Cir. 2010) (quoting *Durkin v. City of Chi.*, 341 F.3d 606, 612-13 (7th Cir. 2003)).

The undisputed evidence shows that Gomez made just two reports of harassment: the first in January 2012, and the second in April 2014. The undisputed evidence also shows that the City responded promptly to each by reiterating with the relevant workforce that harassment and discrimination would not be tolerated and

reviewing applicable policies with them on the very same date. Thereafter, the City commenced investigations into both the notes that caused Gomez to complain, and the additional allegations of harassment he made during those investigations, some of which had occurred years prior. And Gomez was promptly transferred to new fire stations in both instances. The Court reviews each report and subsequent investigation, and the parties' arguments, in more detail below.

**The 2012 investigation.** First, the City contends that it took prompt, appropriate corrective action when Gomez reported harassment in January 2012 sufficient to preclude a finding of employer liability. Following his 2012 complaint, Lieutenant Peters immediately informed Battalion Chief Joseph Santucci and read then-applicable G.O. 93-108 to everyone at the firehouse, informing them that harassment was prohibited and would not be tolerated. He questioned those present about the note, but no one reported having any knowledge of it. Lt. Peters also informed Battalion Chief Joseph Santucci, which ultimately lead to a full investigation and report by the Internal Affairs Division, an investigation that was initiated only two days after Gomez found the note. During the weeks thereafter, Lt. Peters spoke to all firefighters assigned to Engine 110, including minority firefighters with Hispanic surnames, asking whether any of them had experienced racially offensive, harassing or derogatory conduct. None had, and nor had any witnessed others treating Gomez in any offensive or racially discriminatory manner. During this same period, Gomez was transferred out of Engine 110 at his request, and

subsequently told IAD investigators that he was very happy and had no additional complaints.

But Gomez nevertheless finds fault in the City's response to his complaint. First, Gomez contends that it violated G.O. 13-006 because the investigation was conducted by the Internal Affairs Division instead of the EEO Division. R. 82 at 10-11. But G.O. 13-006 took effect in April 2013 and was not applicable at that time, and the Court finds the City's response was reasonable even if it had been. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 387 (7th Cir. 2012) (employer's "failure to follow internal policy does not matter so long as the employer's response is otherwise reasonable under Title VII."). Gomez also takes issue with the fact that some of the interviews were not conducted until September 2012, some 8 months after Gomez reported the note. But the Court does not lay blame on the City here; the delayed interviews with Battalion Chief Santucci and Lieutenant Peters were a result of Santucci's medical leave. And, as noted, Gomez had been transferred to a new fire station months before, and raised no new allegations in the interim despite that he knew how and to whom to report them. On these facts, the Court finds that the City was not negligent in either discovering or remedying the alleged harassment, and that no basis for liability lies with respect to the 2012 investigation.

***The 2014 investigation.*** The City contends that its response to Gomez's 2014 complaint was also reasonable and prompt under the circumstances. It is undisputed that Gomez's 2014 report led him to raise additional allegations of harassment for the first time, some of which arose (but were not reported) during the earlier 2012

investigation. Those allegations and the note itself were the subject of a similar investigation to that conducted in 2012. Specifically, Lt. Maj referenced the applicable General Order in admonishing those present at role call the day of Gomez's complaint, informing them that discrimination would not be tolerated. Lt. Maj also notified Captain Curley and the relieving chief about the incident that day, and informed the regular Battalion Chief Kurt Nelson when he returned three days later. In turn, Nelson immediately notified Deputy District Chief Hoyle Marshall and Assistant Deputy Fire Commissioner Mark A. Nielsen, and the EEO Division commenced an investigation into Gomez's allegations shortly thereafter. And Gomez was assigned to a new fire station which he reported was "fantastic."

But Gomez contends that issues remain for the jury. Gomez's principal arguments concern the fact that during the 2014 investigation, Lt. Soto reported that he heard, but did not report, Comiskey directing racially charged language at Gomez during the knife incident in 2012. First, Gomez contends that Lt. Soto's failure to report that incident at the time violated the EEO Policy requiring supervisors to report potential discrimination and/or harassment even if the employee himself does not. But again, Gomez argues this under an apparent misconception that G.O. 13-006 adopting the EEO Policy applied in 2012, when it did not.

Gomez also argues that the City's failure to investigate and take corrective action with respect to the knife incident in 2012 was negligent, and that had Lt. Soto reported it and the City investigated it at that time, additional harassment—pointing specifically to the 2014 note—may have been prevented. In other words, Gomez seeks

to impute knowledge to the City through Lt. Soto. In response, the City argues that even if Comiskey used the language Lt. Soto reported, it cannot be used to support Gomez's claims because Gomez did not hear it himself and nor was he made aware of it. The Court agrees that remarks made outside of Gomez's hearing are not actionable, and there is no dispute that Gomez did not hear the remarks Lt. Soto contends Comiskey made. Nor did he ever hear Comiskey use racial language. *See* R. 73 ¶¶ 33, 49; *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (no hostile work environment based on racial remarks "made outside [plaintiff's] presence" where "no evidence that [plaintiff] was aware of these remarks"); *see also Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (environment not objectively hostile where "[m]ost of the conduct that forms the basis of [plaintiff's] claim consists of derogatory statements made . . . out of [plaintiff's] hearing" and the rest is "isolated and not particularly severe"); *McLaughlin v. Chi. Transit Auth.*, 263 F. Supp. 2d 1130, 1136-37 (N.D. Ill. 2003) (comments "white b*tch" and "pushy female" made outside of plaintiff's presence not actionable harassment). It follows that those remarks and Lt. Soto's failure to report them cannot form the basis for the City's liability, including because the focus of the analysis is on the *employee's* report, and here there was and could be none. *See Yancick*, 653 F.3d at 549 ("An employer is not liable for co-employee racial harassment 'when a mechanism to report the harassment exists, but the victim fails to utilize it.'" (quoting *Durkin*, 341 F.3d at 612-13)). Gomez offers no authority to the contrary (or at all) on this point.

Gomez also argues that the 2014 investigation was negligent because it reached the wrong result. More specifically, Gomez contends that the City failed to give enough weight to Lt. Soto's statement that Comiskey's behavior and comments toward him the day of the knife incident were physically threatening and racially motivated. But Gomez again ignores the fact that he himself failed to report the knife incident and did not hear the comments Lt. Soto asserts were made. Nor is there any other evidence in the record to support Lt. Soto's allegations. Moreover, when Gomez finally did report the knife incident, the City conducted a thorough investigation—notwithstanding that Gomez himself had not tied and could not tie the incident to any discriminatory animus—and ultimately imposed discipline despite that the conduct had occurred years earlier. The Court finds no negligence here.

Finally, again failing to cite any authority, Gomez argues that the 2014 investigation, resulting in the 2017 suspension of firefighter Comiskey for conduct occurring in 2012 and causing (in part) 2018 workplace training on discrimination, harassment and retaliation, was too lengthy to deem the City's response "prompt." But the investigation's duration resulted in part from the sheer number of issues Gomez raised for the first time (including the knife incident and the additional allegation of retaliation during his lengthy medical leave). And there is no dispute that the City commenced remediation efforts the day of Gomez's initial April 2014 report, including by reinforcing the policy against discrimination and harassment with all staff present and emphasizing that such actions would not be tolerated, and reporting the complaint up the chain as required. Nor can Gomez point to any harm

resulting from the delay. To the contrary, Gomez reported that his new assignment at Engine 86 was "fantastic," and other than the alleged retaliation during his medical leave (which is not part of his complaint), raised no new complaints. Simply put, "[a]lthough the process may have been imperfect, it was not negligent." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1030 (7th Cir. 2004) (while the investigation was "by no means textbook in its execution, we cannot ignore . . . the undisputed fact that [the employer] took prompt action" and that a "stern verbal warning . . . had both the purpose and effect of eliminating further race-based harassment"); *see also Cerros*, 398 F.3d at 954 ("the efficacy of an employer's remedial action is material to our determination whether the action was 'reasonably likely to prevent the harassment from recurring'" (quoting *Williams*, 361 F.3d at 1029 (7th Cir. 2004))); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000) (delay in responding to harassment complaint was not negligent where there was "no evidence that [plaintiff] was in any way injured by [employer's] failure to act more quickly," and "no proof . . . that the harassment continued" after the report.). Accordingly, even if Gomez can otherwise establish that a hostile work environment existed (a point on which the Court takes no position), his claim necessarily fails because no reasonable jury could find that the City was negligent either in uncovering, or responding to, Gomez's complaints.

## Conclusion

For these reasons, the Court grants the City's motion for summary judgment.

R. 64; R. 72.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: June 14, 2019